NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0638n.06

No. 12-4108

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 09, 2013*
DEBORAH S. HUNT, Clerk

LOCKHEED MARTIN CORPORATION, )
)
    Plaintiff-Appellant, )
)
v. )
)
THE GOODYEAR TIRE & RUBBER COMPANY, )  ON APPEAL FROM THE UNITED
)  STATES DISTRICT COURT FOR
    Defendant-Appellee. )  THE NORTHERN DISTRICT OF
)  OHIO
)

Before:  ROGERS and KETHLEDGE, Circuit Judges; and BORMAN, District Judge.[*]

KETHLEDGE, Circuit Judge.  Lockheed Martin Corporation appeals the district court's grant of summary judgment in favor of Goodyear Tire & Rubber Company.  Lockheed sued Goodyear under federal and state law seeking to recover costs spent in the environmental cleanup of a facility known as the Airdock.  We affirm.

I.

In 1929, the Goodyear Zeppelin Corporation built the Airdock, a facility used to manufacture and house blimps.  For the Airdock's siding, Goodyear Zeppelin installed coated steel sheets known

---

[*]The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

as Robertson Protected Metal.  The coating on these sheets contained polychlorinated biphenyls

("PCBs"), a chemical substance now considered to be hazardous waste.  *See* 15 U.S.C. § 2605(e).

Goodyear Zeppelin later sold the Airdock to Goodyear Tire & Rubber Company.  Shortly

thereafter, Goodyear leased the Airdock to its wholly owned subsidiary, Goodyear Aerospace

Corporation ("GAC").  Goodyear continued to lease the Airdock to GAC for the next 46 years.

On March 13, 1987, Goodyear and GAC entered into a written agreement with Loral

Corporation, under which Loral agreed to buy all of GAC's assets and assume all of GAC's

liabilities (the "Asset Purchase Agreement").  Although Goodyear, rather than GAC, held legal title

to the Airdock, Goodyear transferred it to Loral pursuant to the Agreement.  Ten years later, Loral

merged with Lockheed, and Lockheed became the Airdock's owner.

Sixteen years later—in 2003—Lockheed discovered that the Airdock was contaminated with

PCBs.  Tests confirmed that the contamination had also spread to Haley's Ditch, a stream 1,000 feet

north of the Airdock.  Lockheed notified the Environmental Protection Agency, in compliance with

the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*  Lockheed and the EPA then entered into

a consent agreement.  That agreement provided that Lockheed had unlawfully used and disposed of

PCBs beginning on June 30, 1997 (the date Lockheed merged with Loral).  Consequently, the

agreement required Lockheed to clean up the contamination caused by the Airdock and, eventually,

to remove the Airdock's siding.  Lockheed estimates that it has spent more than $31 million on the

cleanup, and that the removal of the siding will cost many millions more.

Lockheed later sued Goodyear, seeking to recover the cleanup costs under the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.

§ 9601 *et seq.*, and Ohio's Voluntary Action Program, Ohio Rev. Code § 3746.01 *et seq.* Under each statute, the default rule is that a company that contaminates a facility is liable for the cleanup costs, even if the company later sells the facility. *See* 42 U.S.C. § 9607(a); Ohio Rev. Code § 3746.23(B). Lockheed therefore argued that Goodyear was liable for the Airdock's cleanup costs because Goodyear contaminated the Airdock with PCBs.

Goodyear moved for summary judgment. In support, Goodyear pointed out that CERCLA and Ohio law each allow a company to transfer its environmental liability to another party by contract. *See* 42 U.S.C. § 9607(e); Ohio Rev. Code § 3746.23(F). Goodyear therefore argued that it had transferred its liability for the Airdock to Loral through the Asset Purchase Agreement.

The district court agreed with Goodyear's interpretation of the Agreement and granted summary judgment in its favor. This appeal followed.

## II.

"We review de novo the district court's grant of summary judgment, as well as decisions on questions of contract interpretation." *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 259 (6th Cir. 2012). Here, the parties agree that Ohio law governs our interpretation of the Agreement. In Ohio, a court's role "[w]hen confronted with an issue of contractual interpretation . . . is to give effect to the intent of the parties" as it "is reflected in the language used in the [contract]." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

## A.

Lockheed argues that the district court erred when it interpreted the Asset Purchase Agreement as transferring Goodyear's environmental liability for the Airdock to Loral. In deciding

whether the Agreement transferred Goodyear's liability, two provisions are particularly relevant.

First, § 2.1 provides:

> GAC and, to the extent necessary, Goodyear hereby agree, on the Closing Date, to convey, transfer, assign and deliver to Loral and Loral agrees, on the Closing Date, to acquire and accept as hereinafter provided, all the assets, properties, business and good will of GAC of every kind and description, wherever located[.]

Second, § 2.2 provides:

> From and after the Closing Date, Loral shall assume and Loral hereby agrees to pay, perform and discharge when due all debts, obligations, contracts and liabilities of GAC of any kind, character or description whether accrued, absolute, contingent or otherwise, whether now or hereinafter arising[.]

The parties agree that these two provisions are related: if something was an "asset[] . . . of GAC" under § 2.1, then any liability associated with that asset was a "liabilit[y] of GAC" under § 2.2. Thus, the issue here is whether the Airdock was an "asset[] . . . of GAC" under the Agreement.

Lockheed contends that the Airdock was not an asset of GAC. In Lockheed's view, the ordinary meaning of the phrase "assets . . . of GAC" is "assets to which GAC held legal title." Lockheed therefore concludes that, "because the Airdock was owned by Goodyear, it was not an asset of GAC." Under Ohio law, however, we do not give words their ordinary meaning if "some other meaning is clearly evidenced from the face or overall contents of the agreement." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292–93 (Ohio 2011) (quotation marks omitted). And here, four parts of the Agreement demonstrate that the parties considered the Airdock to be an "asset[] . . . of GAC[,]" even though it was owned by Goodyear.

First, § 2.1 shows that the phrase "assets . . . of GAC" included at least some assets that Goodyear owned. Section 2.1 provides that "GAC *and, to the extent necessary, Goodyear* hereby

agree . . . to convey, transfer, assign and deliver to Loral . . . all the assets . . . of GAC[.]" (Emphasis added.) If the phrase "assets . . . of GAC" did not include some assets to which Goodyear held legal title, then § 2.1's reference to Goodyear would be meaningless. And under Ohio law, "we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008).

Lockheed responds that § 2.1's reference to Goodyear "reflects the possibility that action by Goodyear (as GAC's parent company) might be necessary to effect the transfer of GAC's assets." For example, Lockheed says that, prior to closing, Goodyear's board of directors approved GAC's transfer of assets to Loral. But in § 2.1, Goodyear did not agree merely to approve *GAC's* transfer of assets. Instead, Goodyear itself agreed "to convey, transfer, assign and deliver" assets to Loral. That is a clear indication that the phrase "assets . . . of GAC[,]" as used in this same paragraph, included some assets to which Goodyear held title.

Second, § 4.4 likewise shows that the phrase "assets . . . of GAC" included assets that were owned by Goodyear but used by GAC. Section 4.4 provides:

> The assets to be reflected on the Adjusted Closing Date Balance Sheet . . . together with all other intangible assets of GAC, will constitute substantially all of the assets and properties used in the conduct of the business of GAC consistent with past practice and on or prior to the Closing Date *all such assets and properties not owned by GAC* at December 31, 1986 *but historically used and necessary to the conduct of the business of GAC will be duly and properly conveyed to Loral*.

(Emphasis added.) The parties included this provision in Section 4 of the Agreement, which was titled "Representations and Warranties of GAC and Goodyear." Section 4.4 is therefore best understood as a representation about the assets that GAC and Goodyear had agreed to transfer in

§ 2.1. Thus, the parties understood the phrase "assets . . . of GAC" to include all the assets that were

"historically used and necessary to the conduct of the business of GAC[.]"

Third, § 4.11 confirms that the parties took a broader view of GAC's assets. Section 4.11

provides:

> Schedule G which is to be delivered within 5 days of the date hereof lists all of the
> real property owned of record or beneficially by GAC and Goodyear and Government
> property used, or in the possession of GAC and all leases of real or personal property
> to which GAC is a party . . . as used in the business of GAC.

According to this provision, GAC and Goodyear had to compile a list of assets that they would

transfer to Loral under § 2.1. That list had to include not only property "owned of record or

beneficially by GAC[,]" but also "Goodyear and Government property used, or in the possession of

GAC[.]" This provision therefore shows that the phrase "assets . . . of GAC" included assets that

were owned by Goodyear but used by GAC.

Fourth, Schedule G shows that the phrase "assets . . . of GAC" included the very asset at

issue here—the Airdock. Again, Schedule G listed all "Goodyear . . . property used, or in the

possession of GAC" that Goodyear had agreed to transfer to Loral under § 2.1. That list included

the Airdock. Thus, Schedule G shows that the parties considered the Airdock to be an "asset[] . . .

of GAC" under the Agreement.

Lockheed views the Agreement differently. In Lockheed's view, the Agreement actually

contained two provisions that transferred assets to Loral: § 2.1, which transferred GAC's assets, and

§ 4.4, which transferred Goodyear's assets. Thus, Lockheed says, the Agreement transferred the

Airdock to Loral as an asset of Goodyear's under § 4.4, without transferring any Airdock-related liabilities.

But this interpretation overlooks the structure of the Agreement. In Section 2—titled "Purchase and Sale of Assets"—the parties included all of the provisions that dealt with the transfer of assets. For example, § 2.3 described how GAC and Goodyear would transfer assets to Loral, § 2.5 listed the purchase price that Loral would pay to GAC and Goodyear, and § 2.6 explained the timing of Loral's payments—not to mention § 2.1's transfer of assets and § 2.2's transfer of liabilities. Section 4.4, in contrast, is merely a representation about the assets that "will be duly and properly conveyed to Loral."

Lockheed also relies on § 2.3, which discusses "[t]he conveyance, transfer, assignment and delivery of the assets and property of GAC and Goodyear to Loral[.]" This provision, Lockheed says, "shows that the parties knew how to refer to the 'assets . . . of GAC and Goodyear' when they intended to." But Lockheed puts too much weight on this provision. It is true that § 2.3 proves that the parties distinguished between GAC's assets and Goodyear's assets. That does not prove, however, that the parties decided whether a particular asset was GAC's or Goodyear's by looking at who held title to it. As shown above, the parties used the phrase "assets . . . of GAC" as a term of art, which included assets that were "historically used and necessary to the conduct of the business of GAC[.]" And given that Goodyear had leased the Airdock to GAC for nearly 50 years, it makes sense that the parties would treat the Airdock as an "asset[] . . . of GAC[.]"

In sum, the terms of the Asset Purchase Agreement show that the parties viewed the Airdock as an "asset[] . . . of GAC" under § 2.1, which means that any liability associated with the Airdock

was a "liabilit[y] of GAC" under § 2.2. The Agreement therefore transferred Goodyear's liability for cleaning up the Airdock to Loral.

B.

Lockheed also argues that Goodyear is liable for cleaning up Haley's Ditch, the stream 1,000 feet north of the Airdock. In support, Lockheed cites 42 U.S.C. § 9607(a)(2), which imposes liability on "any person who[,] at the time of disposal of any hazardous substance[,] owned or operated any facility at which such hazardous substances were disposed of[.]" Lockheed then alleges that Goodyear owned Haley's Ditch at the time the PCBs were "disposed of" there. Thus, Lockheed concludes that Goodyear remains liable for cleaning up Haley's Ditch, even though Goodyear transferred the Airdock to Loral.

The problem with this argument is that CERCLA imposes liability only on the owner of a facility "*at which [the] hazardous substances were disposed of*[.]" 42 U.S.C. § 9607(a)(2) (emphasis added). And here, the PCBs were not "disposed of" at Haley's Ditch. Instead, as Lockheed concedes, the PCBs were released from the Airdock's siding and then spread 1,000 feet north into Haley's Ditch. That type of "passive migration does not constitute a Disposal within the meaning of CERCLA." *Bob's Beverage, Inc. v. Acme, Inc.*, 264 F.3d 692, 697 (6th Cir. 2001). To the contrary, a disposal occurs only when "there was human activity involved in whatever movement of hazardous substances occurred on the property[.]" *United States v. 150 Acres of Land*, 204 F.3d 698, 706 (6th Cir. 2000). There was no human activity involved in the contamination at Haley's Ditch, which means there was no "disposal" here. Goodyear's ownership of Haley's Ditch, therefore, is not a basis to hold Goodyear liable for its cleanup.

Lockheed responds that passive migration suffices under Ohio law, which imposes liability on any person who owned a facility when "the hazardous substances . . . were released at or upon the property." Ohio Rev. Code § 3746.23(B). But Ohio law allows Lockheed to recover only "the costs . . . that are attributable to the releases that [the property owner] caused or contributed to." *Id.* After selling the Airdock, Goodyear did not cause or contribute to the release of any PCBs upon Haley's Ditch. Thus, Goodyear is not liable for the costs of cleaning up Haley's Ditch under Ohio law.

\*　　\*　　\*

The district court's judgment is affirmed.