RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

No. 13-4362

*v.*

STATE OF OHIO; BUCKINGHAM COAL COMPANY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00383—James L. Graham, District Judge.

Argued: October 1, 2014

Decided and Filed: May 21, 2015

Before: GUY, CLAY, and WHITE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** John L. Smeltzer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Daniel J. Martin, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee State of Ohio. John J. Kulewicz, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee Buckingham Coal. **ON BRIEF:** John L. Smeltzer, John S. Most, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Daniel J. Martin, Brian A. Ball, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee State of Ohio. John J. Kulewicz, Michael G. Long, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee Buckingham Coal.

—————————

**OPINION**

—————————

HELENE N. WHITE, Circuit Judge.  The United States appeals from the district court's denial of its motion for summary judgment and grant of the State of Ohio's and Buckingham Coal Company's ("Buckingham") motions for summary judgment in this action challenging Ohio's right to lease Buckingham the right to mine coal lying beneath land acquired for a flood-control project.  We REVERSE.

**I.**

In 1948, the United States and Ohio entered into a cost-sharing agreement to construct and maintain the Tom Jenkins Dam and Burr Oak Reservoir ("Project") to control flooding in southeast Ohio's Hocking River Basin.  The Project was designed and constructed by the United States Army Corps of Engineers ("Corps"), which determined that the Project required the acquisition of certain property interests under and surrounding the dam, including subsurface mineral rights.  The property interests were acquired, the dam was built, and the Project operated within the parties' joint understandings until the instant disagreement.

In 2010, Ohio entered into two subsurface mineral leases with Buckingham, a coal company that owned and mined land surrounding the Project.  The leases granted Buckingham rights to conduct mining activities within Project lands, specifically, to construct a corridor beneath Project lands to connect two non-Project parcels of land Buckingham already owned.[1]  Buckingham was also granted the right to sell any coal extracted in the process.

When the Corps discovered that Ohio entered into the leases with Buckingham, it asked Ohio to cease all mining activities within Project lands until it could determine whether mining would place the Project at risk.  The Corps took the position that Ohio was required to obtain the Corps' approval for any mining activity involving Project lands.  Ohio and Buckingham initially complied with the Corps' request, but after Buckingham altered its mining plans and secured the

—————————

[1]The corridor is located within Project lands at elevation 725 feet, higher than the reservoir pool at 721 feet, but well within the reservoir's crest level of 750 feet.

final license it needed to commence mining, Ohio and Buckingham advised the Corps that Buckingham would no longer cease mining activity and that they did not believe that the cost-sharing agreement precluded the lease to Buckingham.

This prompted the United States to seek a temporary restraining order to prevent Ohio from permitting subsurface mining activities within Project lands. After a hearing, the district court denied the United States' motion for a temporary restraining order, finding that the United States had failed to show a likelihood of success on the merits. Also, relying on a defense expert's testimony, the district court determined that the Project would not be placed at risk by the leases.

The United States filed this action against Ohio and Buckingham seeking, among other things, a declaratory judgment that the terms of the cost-sharing agreement preclude Ohio (or any third party authorized by Ohio) from conducting mining activity in Project lands without prior approval of the Corps. After discovery, all parties moved for summary judgment; the district court determined that "none of the acts, agreements, reports, or plans that form the legal basis for the [Project] clearly and explicitly prohibit Ohio from leasing coal interests in project lands owned by the state." Accordingly, it denied the United States' motion for summary judgment and granted both Ohio's and Buckingham's motions for summary judgment. The United States now appeals.

## II.

We review the grant or denial of summary judgment *de novo*. *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 843 (6th Cir. 2013). We apply Ohio law to this contract dispute.[2] *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In Ohio, contract interpretation is a matter of law subject to *de novo* review on appeal. *City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs.*,

---

[2]The United States initially argues that we should look to federal common law to review the relevant contract provisions. However, as long as state law does not conflict with federal law, and the question is not "uniquely federal" in nature, it is more appropriate to "borrow[], incorporat[e], or adopt[] state law [o]n point." *Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 692 (2006). Indeed, a case cited by the United States makes clear that "where Congress has not adopted a different standard, it is customary to apply the principles of general contract law." *Bituminous Cas. Corp. v. Lynn*, 503 F.2d 636, 640 (6th Cir. 1974). Because the United States did not identify a congressionally mandated "different standard," and it does not appear that this dispute is "uniquely federal" in nature, we apply Ohio law.

115 Ohio St. 3d 387, 392, 875 N.E.2d 561, 568 (2007). "When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties." *Sunoco, Inc. v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 404, 953 N.E.2d 285, 292 (2011). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties," and we may "presume that the intent of the parties is reflected in the language of the contract." *Id.*; *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132, 509 N.E.2d 411, 413 (1987) ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.").

In Ohio, a contract is "unambiguous" if a reviewing court "can give a definite legal meaning" to the contract's terms. *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219, 797 N.E.2d 1256, 1261 (2003). "Common, undefined words appearing in a contract will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the agreement." *Sunoco*, 953 N.E.2d at 292–93 (citations omitted). If a term is ambiguous, parol evidence is admissible to interpret, but not to contradict, the express language of the contract. *Ohio Historical Soc. v. Gen. Maint. & Eng. Co.*, 65 Ohio App. 3d 139, 146, 583 N.E.2d 340, 344 (Ct. App. 10th Dist. 1989) (citations omitted). "[I]f such an ambiguity is alleged, it must arise from the language of the contract itself and, therefore, courts will not admit parol testimony to construe an ambiguity forced into the contract to strain the apparent meaning of the language." *Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.*, 63 Ohio App. 3d 319, 328, 578 N.E.2d 851, 856 (Ct. App. 12th Dist. 1989). Documents created after a contract's execution, however, are not subject to the parol-evidence rule. *Am. Gen. Fin. v. Beemer*, 73 Ohio App. 3d 684, 687, 598 N.E.2d 144, 146 (Ct. App. 3d Dist. 1991).

## III.

The United States argues that the original cost-sharing agreement it entered into with Ohio, coupled with a Real Estate Planning Report created by the Corps, prohibit Ohio's lease of the coal rights to Buckingham. Specifically, the United States argues that a plain reading of documents memorializing Ohio's responsibilities relating to the Project shows that Ohio has an obligation to "retain" all Project lands—including subsurface coal interests—until the Project is

decommissioned or the Corps gives "prior approval." The United States also rejects Ohio's argument that a subsequent quitclaim deed it granted to Ohio relieved Ohio of its "duty to retain the coal." To obtain relief, the United States must prevail on both issues.

**A.**

On September 22, 1947, pursuant to congressional authorization, Pub. L. No. 78–533, 58 Stat. 887, 898 (1944), the Corps prepared and submitted a Definite Project Report ("Project Report"), which set out a general framework for the Project.[3] Although many details needed to be finalized, the Project's purpose was made clear: "Flood alleviation in Sunday Creek and other downstream valleys, and water conservation for water supply and recreational purposes." According to the Project Report, "[t]he dominant factor in all considerations regarding the regulation of the reservoir is flood control."

The Project Report acknowledged that mineable coal was present under Project lands and stated that operation of the Project would prevent mining: "Since operation of the reservoir will prevent mining of the underlying coal, it will be necessary to acquire all coal rights in the lands below elevation 740 feet, plus a horizontal barrier averaging 50 feet in width beyond this elevation for protection of adjacent coal measures from seepage." Accordingly, the Project Report anticipated Ohio acquiring "all coal rights" below elevation 740 feet, and stated that doing so was "necessary" to effectuate the Project as envisioned by the Corps. To be sure, this necessity may have been premised at least in part on the fact that operation of the reservoir would impair the ability of the holder of the mineral rights to access the coal, but the Project Report clearly anticipated that there would be no coal mining on Project lands.

**B.**

In 1948, Ohio and the United States executed Articles of Agreement ("Agreement"), which expressly referenced and expanded on the Project Report. The Agreement set out each

---

[3]Ohio argues that it is not bound by the Project Report because it did not execute it. However, the 1948 Articles of Agreement expressly incorporated the Project Report by providing that "[t]he State shall . . . acquire all lands and/or interests in land necessary for said Project, in accordance with said approved plan." The "approved plan" was defined in the Agreement to refer to the Project Report; thus, the quoted language incorporated that document. *See Blanchard Valley Farmers Coop. Inc. v. Carl Niese & Sons Farms, Inc.*, 143 Ohio App. 3d 795, 802, 758 N.E.2d 1238, 1244 (Ct. App. 3d Dist. 2001) ("Documents that are incorporated by reference into a contract are to be read as though they are restated in the contract.").

party's obligations for constructing and maintaining the Project, including cost allocation and division of long-term responsibilities.  As the district court observed, the Agreement itself does not prohibit Ohio from leasing out coal rights.  Indeed, the Agreement does not specifically address subsurface mineral rights at all.  The United States argues that the Agreement requires Ohio to "retain" all "necessary" lands, which includes subsurface mineral rights, because Ohio was required to "acquire" lands "necessary" for the Project and Ohio's obligation to "acquire" the lands is useless without a corresponding obligation to also "retain" them.  The Agreement echoes this understanding, expressly granting the United States the right to "enter upon [Project] lands to be *retained* by Ohio" and "to flood [Project] lands and/or interests in land to be *retained* by Ohio."[4]

Under the Agreement, Ohio was required to "acquire all lands and/or interests in land *necessary* for said Project, in accordance with [the Project Report]."  The Agreement also provided that if Ohio did not acquire the "necessary" lands fast enough, the United States had the option to itself acquire the necessary lands in Ohio's stead, and then be reimbursed by Ohio, subject to Ohio's financial-contribution cap.  All parties envisioned Ohio ultimately holding the Project lands, except the land needed for the actual dam, which would be held by the United States.  The details of the acquisition, however, were to "be in accordance with the land acquisition program to be agreed upon between the [Corps] and the State."

## C.

In October 1948, to further define Ohio's and the United States' obligations and rights under the Agreement, the Corps prepared, and Ohio and the United States executed, a Real Estate Planning Report ("Planning Report"), which constituted the "land acquisition program" contemplated in the Agreement.  The Planning Report echoed the Project Report's approach to the coal:  "[S]ince operation of the reservoir will prevent future mining, it will be *necessary* for Ohio to acquire the coal underlying the lands below elevation 740, the spillway crest level, plus the coal in a barrier sufficient in width beyond this elevation to protect adjacent coal measures

---

[4]As discussed *infra*, because the United States had an option to acquire some Project lands itself, expressly stating which party would "retain" Project lands was particularly appropriate; in fact, there was at least some duration of time (1950 – 1962) where the United States held title to lands that were supposed to be "retained" by Ohio.

from seepage." The Corps "estimated that it [would] be *necessary* for the State *to acquire the coal*, oil, and gas, and to *extinguish outstanding rights thereto*, in the lands (approximately 1,450 acres) underlying elevation 750." The Planning Report acknowledged that "[t]he greater portion of the coal affected by the [Project] is owned by mining companies or individuals other than the owners of the surface." Thus, "as a minimum requirement," Ohio was required to "acquire . . . the coal in the lands lying below elevation 750."

Ohio argues that the lands were only "necessary" because the United States was trying to extinguish legal claims that might arise when the reservoir floods. Although there is some support for this interpretation, that this appears to be one purpose behind acquiring the "necessary" lands does not mean it was the only purpose. The United States was certainly interested in avoiding legal claims arising from the Project's anticipated use, but it also sought to secure the unfettered ability to control flooding in southeast Ohio's Hocking River Basin and to extinguish any potential assertion of property rights that might interfere with its judgment regarding the Project. Whether to extinguish legal claims or to guarantee control of the Project's structural integrity, it was clearly contemplated that "operation of the reservoir will prevent future mining."

Indeed, Ohio does not dispute that it is precluded from adversely affecting the Project's efficacy or structural integrity; nevertheless, it argues that its lease to Buckingham is not problematic because it has determined that the mining activities within Project land will not threaten the Project.[5] But accepting Ohio's and Buckingham's interpretation of the contract as allowing Ohio the unilateral right to make this determination subject to proof to the contrary would require the United States to litigate each time it disagrees with Ohio's determination regarding a particular activity's likelihood of threatening the Project's structural integrity. This undermines the parties' intent and understanding in entering into the Agreement and Planning Report.

---

[5]Ohio's legislation approving the lease at issue expressly states that the lease and subsequent mining operations cannot adversely affect the Project. Ohio Rev. Code § 1541.083 (stating that coal extraction can "in no way affect the surface of the land or the use of the land as a public park" and authorizing the Chief of Ohio's Division of Parks and Recreation to determine whether the Project would be affected).

The United States required Ohio to acquire land "necessary" for the Project. It included in the definition of such land "coal in the lands lying below elevation 750," so it would not have to incur the time and expense of litigating to protect the Project, or worse, alter the Project's operation to avoid litigation (even if the United States were to ultimately prevail). In light of the Planning Report's requirement that Ohio acquire and extinguish all coal rights, "[t]he greater portion of [which were] owned by mining companies or individuals other than the owners of the surface," we conclude that the Agreement and Planning Report did not grant Ohio a unilateral right to sell, lease, or otherwise dispose of those very same rights to a third party to resurrect and exercise those rights.

**D.**

Notably, the Planning Report states: "As provided in the [A]greement, the State will retain and utilize the lands acquired above elevation 750 for development of conservational and recreational features of the project, it being expressly understood and agreed that *sale or disposal of any lands* acquired by the State, pursuant to the agreement, will be subject to *prior approval* of the District Engineer." The United States argues that Ohio's lease constitutes "disposal" of "lands" and thus required its "prior approval." The trial court concluded that "disposal" includes Ohio's lease to Buckingham because coal was removed from Project lands, but the lease was not a "disposal" of "lands" because the "disposal" was of coal found within specific tracts of land, not land itself.

"Land" is not defined in the Agreement or Planning Report, so we apply its ordinary meaning: "An immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, *the space above and below the surface*, and everything growing on or permanently affixed to it; an estate or interest in real property." Black's Law Dictionary 1008 (10th ed. 2014) (emphasis added). "Land" clearly includes subsurface mineral rights, which are "interests in real property" found "below" the earth's surface. *See id.* Ohio disposed of Project lands by leasing the mineral rights in such lands to Buckingham. Under the Planning Report, Ohio needed the Corps' "prior approval" to dispose of "necessary" Project lands, including coal interests.

**IV.**

Ohio and Buckingham further assert that the United States gave up any rights it might have had to control coal mining when it gave Ohio a quitclaim deed to the Project lands.  Again, we disagree.  On October 11, 1962, "[i]n compliance with and [in] furtherance of the provisions of [the Agreement]," the United States prepared and executed a quitclaim deed ("1962 Quitclaim Deed") to grant Ohio all lands the United States had acquired for the Project.  The grant expressly included subsurface mineral interests:  "Grantor does hereby Remise, Release and forever Quitclaim . . . all the right, title and interest of the Grantor in and to the coal underlying the tracts of land," subject to stated exceptions and reservations.

Buckingham and Ohio argue that under Ohio's "merger-by-deed" doctrine the 1962 Quitclaim Deed superseded the Agreement and Planning Report.  "[A]n application of the contract canon of integration," *Suermondt v. Lowe*, 165 Ohio App. 3d 427, 432, 846 N.E.2d 910, 913 (Ct. App. 5th Dist. 2006) (quoting 14 Powell on Real Property (1995) 81A–136, Section 81A.07(1)(d)), the doctrine provides that "[w]here a deed is delivered and accepted without qualification pursuant to an agreement, the agreement merges with the deed, and no cause of action upon the agreement thereafter exists," *Dillahunty v. Keystone Savs. Ass'n.*, 36 Ohio App. 2d 135, 137, 303 N.E.2d 750, 751 (Ct. App. 2d Dist. 1973).  However, "'[m]erger by deed' is a canon of construction that aids courts in determining what the true intent of the parties to a real estate transaction was at the time of a sale."  *Shah v. Smith*, 181 Ohio App. 3d 264, 267, 908 N.E.2d 983, 985–86 (Ct. App. 1st Dist. 2009).  "Thus, if it can be shown that the parties actually intended that the provisions of a prior agreement continue in force, then the provisions do so continue."  *Id.* at 432.  Here, the 1962 Quitclaim Deed expressly refers to the Agreement, and did not displace or otherwise affect the parties' obligations under the Agreement and Planning Report.

The 1962 Quitclaim Deed was not intended to displace or supersede the Agreement.  Rather, it operated to place the parties in the position they originally contemplated.  Although Ohio was supposed to acquire all of the Project lands, the United States actually acquired a portion of the necessary lands, using funds designated for this purpose, when Ohio was unable to timely do so.  The 1962 Quitclaim Deed simply transferred ownership of these lands to Ohio as

originally envisioned, and expressly states that it was granted "[i]n compliance with and [in] furtherance of the provisions of [the Agreement]." Unlike the usual situation in which the doctrine is applied, the Agreement was not simply an agreement to purchase lands that would later merge into the deed. Rather, it governed the continuing relationship between the parties. Because the parties clearly intended the Agreement to survive the 1962 Quitclaim Deed, the doctrine of merger by deed does not apply. *See Suermondt*, 846 N.E.2d at 913.[6]

## V.

For the foregoing reasons, we conclude that Ohio lacked the authority to enter into the instant leases. We **REVERSE** the district court's grant of summary judgment to Ohio and Buckingham and its denial of the United States' motion for summary judgment, and **REMAND** for entry of judgment consistent with this opinion.

---

[6]Buckingham also argues that it is a bona fide purchaser for value without notice of the encumbrance and thus that its interests cannot be extinguished because the United States did not record this alienation on the land. This argument fails, as Buckingham, a lessee, is not a bona fide purchaser for value. *See Basil v. Vincello*, 50 Ohio St. 3d 185, 191, 553 N.E.2d 602, 608 (1990); *see also Villa v. Rodriguez*, 79 U.S. 323, 338 (1870).