**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0539n.06

**No. 14-4078**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| GOODYEAR TIRE AND RUBBER COMPANY, | ) | |
| | ) | **FILED**<br>Jul 30, 2015<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| LOCKHEED MARTIN CORPORATION, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:  BOGGS and KETHLEDGE, Circuit Judges; and BLACK, District Judge.[*]

BOGGS, Circuit Judge.  In 1987, Goodyear Tire & Rubber Company ("Goodyear") entered into an Asset Purchase Agreement (the "Agreement") with Loral Corporation whereby Loral agreed to buy all assets and assume all liabilities of a Goodyear affiliate.  One of the assets covered by the Agreement was the Airdock, a massive facility built in Akron, Ohio in 1929 to manufacture and house blimps.  In 1997, Loral merged with Lockheed Martin Corporation ("Lockheed"), and Lockheed took ownership of the Airdock.

In 2003, Lockheed discovered that the Airdock's original siding was contaminated with non-liquid polychlorinated biphenyls ("PCBs"), a chemical substance that is now considered to be hazardous waste.  Lockheed notified the Environmental Protection Agency and entered into a consent agreement that required Lockheed to clean up the PCB contamination and remove the

---

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

Airdock's siding. Lockheed has spent tens of millions of dollars on the cleanup and will need to spend millions more to complete it.

In an attempt to recover the cleanup costs, Lockheed sued Goodyear in 2010 under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and Ohio's Voluntary Action Program, Ohio Rev. Code § 3746.01 et seq. In response, Goodyear argued that it had transferred its environmental liability for the Airdock to Loral (and therefore to Lockheed) in the Asset Purchase Agreement. The district court agreed and granted summary judgment to Goodyear in a decision that was affirmed by this court in 2013 (the "Airdock Litigation").

The dispute now returns to us for a second time. After its victory in the Airdock Litigation, Goodyear sought to recover under the Asset Purchase Agreement's indemnification provisions for the litigation expenses and attorney's fees that it incurred in defending against Lockheed's initial suit. The district court below ruled that the expenses did not fall within Lockheed's indemnification obligations and granted summary judgment to Lockheed. For the reasons given below, we affirm.

I

A

In our opinion regarding the dispute over the cleanup costs in the Airdock Litigation, we described the factual background as follows:

> In 1929, the Goodyear Zeppelin Corporation built the Airdock, a facility used to manufacture and house blimps. For the Airdock's siding, Goodyear Zeppelin installed coated steel sheets known as Robertson Protected Metal. The coating on these sheets contained polychlorinated biphenyls ("PCBs"), a chemical substance now considered to be hazardous waste. *See* 15 U.S.C. § 2605(e).

Goodyear Zeppelin later sold the Airdock to Goodyear Tire & Rubber Company. Shortly thereafter, Goodyear leased the Airdock to its wholly owned subsidiary, Goodyear Aerospace Corporation ("GAC"). Goodyear continued to lease the Airdock to GAC for the next 46 years.

On March 13, 1987, Goodyear and GAC entered into a written agreement with Loral Corporation, under which Loral agreed to buy all of GAC's assets and assume all of GAC's liabilities (the "Asset Purchase Agreement"). Although Goodyear, rather than GAC, held legal title to the Airdock, Goodyear transferred it to Loral pursuant to the Agreement. Ten years later, Loral merged with Lockheed, and Lockheed became the Airdock's owner.

Sixteen years later—in 2003—Lockheed discovered that the Airdock was contaminated with PCBs. Tests confirmed that the contamination had also spread to Haley's Ditch, a stream 1,000 feet north of the Airdock. Lockheed notified the Environmental Protection Agency, in compliance with the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* Lockheed and the EPA then entered into a consent agreement. That agreement provided that Lockheed had unlawfully used and disposed of PCBs beginning on June 30, 1997 (the date Lockheed merged with Loral). Consequently, the agreement required Lockheed to clean up the contamination caused by the Airdock and, eventually, to remove the Airdock's siding. Lockheed estimates that it has spent more than $31 million on the cleanup, and that the removal of the siding will cost many millions more.

Lockheed later sued Goodyear, seeking to recover the cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and Ohio's Voluntary Action Program, Ohio Rev. Code § 3746.01 *et seq.* Under each statute, the default rule is that a company that contaminates a facility is liable for the cleanup costs, even if the company later sells the facility. See 42 U.S.C. § 9607(a); Ohio Rev. Code § 3746.23(B). Lockheed therefore argued that Goodyear was liable for the Airdock's cleanup costs because Goodyear contaminated the Airdock with PCBs.

Goodyear moved for summary judgment. In support, Goodyear pointed out that CERCLA and Ohio law each allow a company to transfer its environmental liability to another party by contract. See 42 U.S.C. § 9607(e); Ohio Rev. Code § 3746.23(F). Goodyear therefore argued that it had transferred its liability for the Airdock to Loral through the Asset Purchase Agreement.

The district court agreed with Goodyear's interpretation of the Agreement and granted summary judgment in its favor.

*Lockheed Martin Corp. v. Goodyear Tire & Rubber Co.*, 529 F. App'x 700, 701–02 (6th Cir. 2013).

In the Airdock Litigation appeal, we agreed with the district court that the Agreement transferred Goodyear's liability for the cleanup to Loral and thereby to Lockheed when it merged with Loral. *Id.* at 705. After noting that CERCLA and Ohio law each allow companies to transfer environmental liability by contract, we determined that the Airdock was an "asset[] . . . of GAC" for the purposes of the Agreement and that "[t]he Agreement therefore transferred Goodyear's liability for cleaning up the Airdock" to Lockheed. *Id.* at 702, 705.

B

Fresh off of its victory in round one, Goodyear filed a complaint on November 5, 2013, seeking indemnification from Lockheed for the fees, costs, and expenses incurred in defending the Airdock Litigation. Goodyear argued that its expenses from the Airdock Litigation fell within § 6.19.2 of the Asset Purchase Agreement, which sets out Loral's—and therefore Lockheed's—obligations to indemnify Goodyear for various expenses. The district court disagreed and held that Goodyear's expenses were not covered by § 6.19.2 as a matter of law. *Goodyear Tire & Rubber Co. v. Lockheed Martin Corp.*, No. 5:13 CV 2465, 2014 WL 4852129, at *7 (N.D. Ohio Sept. 29, 2014). The court granted summary judgment in favor of Lockheed, and Goodyear now appeals.

II

We review a district court's grant of summary judgment de novo. *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 821 (6th Cir. 2015). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Our interpretation of the Asset Purchase Agreement is governed by Ohio law. Under Ohio law, "contract interpretation is a matter of law subject to *de novo* review on appeal." *United States v. Ohio*, 787 F.3d 350, 353 (6th Cir. 2015) (citing *City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs.*, 875 N.E.2d 561, 568 (Ohio 2007)). As is our general approach in contract disputes, "our role is to give effect to the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). We will read the provisions of the contact as a whole and derive the parties' intent from the contract's plain meaning. *Ibid.*

III

A

The Asset Purchase Agreement includes cross-indemnification provisions reflecting Goodyear's (and GAC's) indemnification obligations to Loral (and Lockheed), and Loral's (and Lockheed's) indemnification obligations to Goodyear (and GAC).[1] In order to fulfill its obligation to read the Agreement as a whole and give effect to each of its provisions, *see Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004), the district court read the cross-indemnification provisions together. *See Goodyear*, 2014 WL 4852129, at *5.

---

[1] For ease of reference, we refer to Goodyear and GAC collectively as Goodyear, and Loral and Lockheed collectively as Lockheed.

Section 6.19.2 sets out Lockheed's indemnification obligations to Goodyear in part as follows:

> Loral agrees to indemnify and hold GAC and Goodyear . . . harmless from and against, and upon their respective demand to pay or reimburse them . . . *for any claim arising out of the operations of GAC subsequent to the Closing Date . . . .*

(emphasis added). Section 6.19.1, in contrast, sets out Goodyear's indemnification obligations to Lockheed. That provision states:

> GAC and Goodyear, jointly and severally, agree to indemnify and hold Loral . . . harmless from and against, and upon their demand to pay or reimburse them for . . . *any claims, actions, suits or proceedings* . . . relating to contamination or adverse effect on the environment . . . *caused by, attributable or relating to or arising out of the operation, use, control or ownership on or prior to the Closing Date of the [Airdock] . . . .*

(emphases added). The parties agree that the Airdock Litigation constitutes a "claim" for these purposes but dispute whether that claim "ar[ose] out of the operations" of the Airdock prior or subsequent to the Agreement's closing date in 1987.

The district court determined that Goodyear's obligations under § 6.19.1 "depen[d] upon whether the claim was 'caused by, attributable or relating to or arising out of the operation, use, control or ownership [of the Airdock] prior to the Closing Date,' and not when the claim was discovered or submitted to Goodyear pursuant to the post-closing timeframes of that section." *Goodyear*, 2014 WL 4852129, at *5. The court then stressed that the relevant language from § 6.19.2, which sets out Lockheed's indemnification obligations for "any claim arising out of the operations of GAC subsequent to the Closing Date," "is similar, but not identical, to section 6.19.1." *Ibid.* There was nothing in the provisions' text or structure, however, to suggest that

the "arising out of" language should be interpreted differently in the separate indemnification provisions. *Ibid.*

In interpreting Lockheed's indemnification obligations under § 6.19.2, the district court applied the Nearest-Reasonable-Referent Canon to determine that the "subsequent to the Closing Date" language in that section modifies "operations of GAC,"[2] and not "claim." *Id.* at *6. Thus, the district court determined that "Lockheed's indemnification obligations are triggered by claims 'caused by, attributable to or relating to or arising out of' the operations of the Airdock after 1987—not by claims caused by or attributable to or relating to Airdock operations prior to closing—even if those claims may not be discovered or asserted until after closing." *Id.* at *5. In the court's view, "[t]he cross-indemnification provisions of the [Agreement] contain clear and unambiguous lines of demarcation between pre-closing and post-closing operations," and "the only reasonable interpretation of section 6.19.2 is that the time when a claim arises is determined by when the operations causing the claim occurred, or when the operations to which the claim is related to or attributable, occurred." *Id.* at *6.

The district court then examined whether Lockheed's claim against Goodyear in the Airdock Litigation arose from operations of the Airdock prior or subsequent to the closing date of the Agreement in 1987. If the claim arose from operations prior to 1987, then the claim would fall outside Lockheed's indemnification obligations under § 6.19.2. If the claim arose from operations subsequent to 1987, then the claim would fall within § 6.19.2 and Goodyear could recover.

The district court ultimately held that "Lockheed's claims against Goodyear in the Airdock Litigation did not arise after the Closing Date," and thus "those claims do not trigger

---

[2] The parties agreed that "operations of GAC" in effect means "operations of the Airdock" in this case. *See Goodyear*, 2014 WL 4852129, at *4.

Lockheed's indemnification obligations under section 6.19.2." *Id.* at \*7. The court reasoned that Lockheed's claim did not arise from post-closing operations or remediation costs from cleaning up the PCB contamination but rather from the pre-closing use of PCBs in the construction of the Airdock. *See ibid.* ("Lockheed's claims against Goodyear regarding PCB cleanup at the Airdock were attributable or related to—arose from—utilization of PCB containing materials in the construction of the Airdock and the continued presence of those hazardous materials in connection with the operation of the Airdock for over 50 years prior to the Closing Date.").

B

On appeal, Goodyear seems not to dispute the district court's interpretation of the indemnity provisions. Rather, Goodyear takes issue with the district court's conclusion that Lockheed's claim in the Airdock Litigation "did not arise after the Closing Date." Appellant Br. 18 (quoting *Goodyear*, 2014 WL 4852129, at \* 7). Before this court, Goodyear asserts that the Airdock Litigation in fact constitutes a claim arising out of post-closing operations at the Airdock.

1

In support of its assertion, Goodyear first argues that the basis for the consent agreement between Lockheed and the EPA regarding the PCB contamination and cleanup "was Lockheed's own post-closing operations at the Airdock," and "Lockheed's liability therefore derived from its operations at the Airdock conducted years after the ink had dried on the [Agreement]." *Ibid.* "Thus," the argument goes, "the costs sought by Lockheed associated with these proceedings 'aris[e] out of' post-closing, not pre-closing, operations." *Ibid.*

The problem with Goodyear's argument is that, while the consent agreement and the associated cleanup may relate to post-closing activities (i.e., the continued presence of PCBs in

the Airdock and their spread to the surrounding areas), the "operations" that gave rise to Lockheed's "claim" against Goodyear regarding that contamination occurred decades before the Asset Purchase Agreement's closing in 1987.

In the Airdock Litigation, Lockheed "argued that Goodyear was liable for the Airdock's cleanup costs *because Goodyear contaminated the Airdock with PCBs*." *Lockheed*, 529 F. App'x at 702 (emphasis added); *see also Goodyear*, 2014 WL 4852129, at *6 ("[I]n the Airdock Litigation, Lockheed sued Goodyear to recover for use and disposal of PCBs on the site during the decades that the Airdock was owned and operated by *Goodyear* and its predecessors/subsidiaries, all of which necessarily occurred *prior to or on* the Closing Date."). In effect, Lockheed sought to impose liability on Goodyear because Goodyear operated the Airdock "at the time," 42 U.S.C. § 9607(a), that the PCBs were introduced to the site. Thus, the "operations" "out of" which Lockheed's claim "ar[ose]" are those that caused the contamination of the facility with PCBs in the first place—specifically, the construction of the Airdock in 1929 and its maintenance over the subsequent decades. *Lockheed*, 529 F. App'x at 701–02.[3]

Goodyear's reliance on the text of Lockheed's consent agreement with the EPA does not change the outcome. That agreement identifies the Robertson Protected Metal ("RPM") used in the Airdock's construction as a "PCB Article" and a "PCB Item" as defined in 40 C.F.R. § 761.3. The agreement then describes two counts against Lockheed for violating environmental regulations and statutes. First, it asserts that Lockheed engaged in the unauthorized use of PCBs—specifically, that Lockheed "has used the RPM in the Airdock continuously from

---

[3] This conclusion is supported by our decision in the Airdock Litigation appeal, in which we stressed that "Goodyear's liability for cleaning up the Airdock" was "transferred" by the Asset Purchase Agreement as a "liabilit[y] of GAC." *Lockheed*, 529 F. App'x at 705. If liability for the cleanup did not arise from pre-closing operations by Goodyear, it would not have been a liability in existence at the time the Agreement was signed and thus could not have been transferred by that Agreement to Loral/Lockheed.

approximately June 30, 1997 to the present" and this use "constitutes, for each day, a violation." Second, the agreement asserts that Lockheed engaged in the unauthorized disposal of PCBs— specifically, that Lockheed "fail[ed] to properly dispose of" PCBs released from the RPM at the Airdock "from June 30, 1997 to the present." Based on these allegations, Goodyear maintains that the consent agreement establishes that "Lockheed's liability to the EPA derived from its own post-closing operation of the . . . Airdock." Appellant Br. 22.

The consent agreement does suggest that Lockheed's violation of environmental regulations, and thus Lockheed's liability to the EPA, arose from Lockheed's post-closing operations at the Airdock. For the purposes of indemnification under the Asset Purchase Agreement, however, we are concerned with the operations that gave rise to *Lockheed's* claims against *Goodyear* for indemnification or contribution, not the operations that gave rise to the *EPA's* claims against *Lockheed* for unlawful use of PCBs. The consent agreement establishes that Lockheed improperly used and improperly disposed of PCBs after 1997, which are the post-closing operations that gave rise to Lockheed's liability to the EPA. It does not establish, however, that Lockheed was responsible for *contaminating* the Airdock with PCBs in the first place. That contamination, upon which Lockheed's claim in the Airdock Litigation was premised, resulted from the pre-closing operations of Goodyear.

2

Goodyear next argues that the fact that Lockheed sought to hold Goodyear liable for cleanup and remediation *costs* incurred post-closing suggests that Lockheed's claim necessarily arose from post-closing *operations*. In the Airdock Litigation, Lockheed sought to recover from Goodyear "all necessary costs" incurred in response to the consent agreement and PCB cleanup, as well as response costs Lockheed "may incur in the future at the Airdock." Goodyear

maintains that this demonstrates a connection between Lockheed's claim and its post-closing operations. *See* Appellant Br. 23. For similar reasons, this argument fails.

There is no doubt that Lockheed incurred (and will continue to incur) costs in remediating the PCB contamination after the closing date. Similarly, it is reasonable to assume that the extent of the damages associated with the contamination increased post-closing as the contamination spread. The extent of the damages, however, does not affect the underlying basis for Lockheed's claim in the Airdock Litigation for the purposes of the indemnification provisions. Rather, the only question under § 6.19.2 and § 6.19.1 is what "operations" gave rise to Lockheed's claim in the first place. Whether Lockheed discovered and began remediating the contamination in 1987, 2003, or 2019, the operations that gave rise to the resulting claim—i.e., the construction of the Airdock causing its contamination with PCBs—remain the same.

Goodyear's argument, in fact, would undermine the effect of the Asset Purchase Agreement's cross-indemnification provisions. Goodyear suggests that Lockheed's claim in the Airdock Litigation necessarily arose from Lockheed's post-closing operations at the Airdock because Lockheed sought contribution for costs arising after closing. *See* Appellant Br. 24–25. However, Loral/Lockheed only took over control of the Airdock upon the closing of the Asset Purchase Agreement in 1987, and thus Loral/Lockheed, by definition, could only incur—and thereafter seek indemnification or contribution for—cleanup and remediation costs arising after closing. Under Goodyear's reading of the indemnification provisions, then, *every* claim by Lockheed would arise from post-closing operations and fall within Lockheed's indemnification obligations under § 6.19.2, and *no* claim by Lockheed would fall within Goodyear's indemnification obligations for claims arising out of pre-closing operations under § 6.19.1. Interpreting the Asset Purchase Agreement in such a manner would defeat the intent of the

parties to establish cross-indemnification obligations and would run afoul of our responsibility to read the Agreement "as a whole" and "give effect to each provision." *Saunders*, 801 N.E.2d at 455.

3

In a final attempt to recoup costs from Lockheed, Goodyear argues for the first time on appeal that § 6.19.2 establishes that Lockheed is responsible for Goodyear's losses if they resulted "in whole *or in part*" from any claim arising out of the post-closing operations of the Airdock. Appellant Br. 26 (emphasis added). This argument would seem to fail in light of our conclusion above that the construction operations that gave rise to Lockheed's claim in the Airdock Litigation occurred prior to closing. In any event, Goodyear did not present this theory before the district court, and the record does not enable us to determine whether or to what extent Lockheed's post-closing use of the Airdock contributed "in part" to Goodyear's defense costs in the Airdock Litigation. We therefore need not address this argument further. *Cf. Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court.").

IV

In conclusion, we hold that Lockheed's claim in the Airdock Litigation arose from pre-closing operations of the Airdock and thus falls outside Lockheed's indemnification obligations under § 6.19.2 of the Asset Purchase Agreement. We therefore AFFIRM the district court's judgment.